SIMMONS, INC., Plaintiff,

v.

BOMBARDIER INC. and Bombardier Motor Corporation of America, and Bombardier Recreation Products, Inc., Defendants.

No. 1:01–CV–00048 PGC.

United States District Court, D. Utah, Northern Division.

July 27, 2004.

**1190**

David G. Mangum, David M. Bennion, Margaret N. McGann, Parsons, Behle &

Latimer, Salt Lake City, UT, Cynthia M. Klaus, Larkin, Hoffman, Daly & Lindgren, Ltd., Bloomington, MN, Alan M. Anderson, Sharna A. Wahlgren, Christopher K. Larus, Stuart K. Ford, Laura J. Borst, Fulbright & Jaworski, LLP, Minneapolis, MN, for Plaintiff.

James S. Jardine, Rick L. Rose, Rick B. Hoggard, Samuel C. Straight, David E. Finkelson, Ray, Quinney & Nebeker, Salt Lake City, UT, Scott J. Pivnick, Robert J. Walters, Pillsbury Winthrop, LLP, Washington, DC, Kevin T. Kramer, William P. Atkins, James R. Menker, Pillsbury Winthrop, LLP, McLean, VA, for Defendants.

### ORDER AND MEMORANDUM OPINION ON MOTIONS FOR SUMMARY JUDGMENT

CASSELL, District Judge.

Plaintiff Simmons Inc. has alleged that the Defendants (referred to collectively as Bombardier) have infringed claims 1, 2, 6, 9, 10, and 11 of U.S. Patent No. 5,386,594 (the "594 patent" or "patent 594"). The prosecution history of the 594 patent is long and complicated and will be set forth as relevant below. Litigation over the 594 patent also has a history, including prior litigation in the District of Minnesota.[1] This matter achieved a temporary resolution in this District before Judge Kimball when a summary judgment of non-infringement was granted to Bombardier based on Judge Kimball's thorough review of claim construction issues.[2] However, the Federal Circuit reversed the grant of summary judgment and,

---

1. *Simmons, Inc. v. Koronis Parts, Inc.,* 2001 WL 1095008 (D.Minn.2001).

2. *Simmons, Inc. v. Bombardier Inc.,* 2002 WL 31956160 (D.Utah 2002).

rather than resolving the disputed issues themselves, remanded.[3] This court now has the responsibility of attempting to resolve the remaining issues. The parties were before the court for oral argument on July 20, 2004 on several motions, including: (1) Plaintiff's Motion for Summary Judgment on Claim Construction; (2) Defendant's Motion for Summary Judgment of Non–Priority Under 35 U.S.C. § 120; (3) Plaintiff's Motion for Summary Judgment on No Inequitable Conduct; (4) Defendants' Motion for Summary Judgment of Non–Infringement and/or Invalidity of Simmons' Patent; (5) Plaintiff's Motion for Summary Judgment of No Anticipation; (6) Plaintiff's Motion for Summary Judgment of No Obviousness; and (7) Defendants' Motion for Summary Judgment of Non–Willfulness. The court found oral arguments instructive. The court took the matter under advisement and now issues its ruling.

## BRIEF BACKGROUND

This action involves a dispute among competing manufacturers of snowmobile skis. Verlin Simmons started Simmons, Inc., in 1988. Simmons is a Utah company which manufactures and sells a variety of snowmobile related parts and accessories, including a commercial embodiment of United States Patent No 5,836,594 under the federally registered mark Flexi–Ski.

On April 10, 2001, Simmons filed a complaint alleging that Bombardier's Precision Ski infringed the 594 patent. Bombardier manufactures and sells snowmobiles and related products, including snowmobile skis under the Ski–Doo mark.

The claimed invention relates to skis used on snowmobiles and similar vehicles to support such vehicles, to facilitate their movement across snow and ice, and to provide directional guidance for them. Simmons alleges that Bombardier's Precision Ski infringes claims 1, 2, 6, 9, 10, and 11 of the 594 patent. Claims 1 and 10 are independent claims. Claims 2 and 9 are claims that depend from claim 1. This means that an infringing device must have all of the elements or limitations of independent claim 1 as well as those of the dependent claims. Specifically, claim 2 depends from claim 1 and adds the limitation that the bottom and side portions form a channel. Claim 6 of the 594 patent depends from claim 2 and specifies the additional limitation that the front portion of the "bottom" of the snowmobile ski based specified in claim 1 "compris[e] a concavity." Claim 9 depends from claim 1 and adds the limitation that the side portions taper down at the front and up at the rear of the ski. Claim 10 is an independent claim which is a combination of the limitations of claims 1 and 9. Claim 11 depends from claim 10 and is a combination of claims 10 and 2.

### Plaintiff's Motion for Summary Judgment on Claim Construction (# 207–1)

■ The first step a court must take in a patent infringement case is to construe the claims of the patent to determine their scope.[4] Claim construction is an issue of law for the district court to decide.[5]

3. *Simmons, Inc. v. Bombardier Inc.*, 73 Fed. Appx. 421 (Fed.Cir.2003), *cert. denied*, —— U.S. ——, 124 S.Ct. 1424, 158 L.Ed.2d 88 (2004).

4. *Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1304 (Fed.Cir.1999).

5. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 983 (Fed.Cir.1995) *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

■ The court generally must "presume that the terms in the claim mean what they say" and "give full effect to the ordinary and accustomed meaning of the claim terms."[6] However, the "intrinsic evidence" must still be examined "to determine whether the patentee has set forth an explicit definition of a term contrary to its ordinary meaning, has disclaimed subject matter, or has otherwise limited the scope of the claims."[7]

The court will discuss below only the language that is disputed. The court otherwise finds that the proposed constructions put forth by Simmons are correct. Thus, where Bombardier does not dispute the construction put forth by Simmons, the court adopts Simmons' construction.

### Claim 1

Claim 1 of the 594 patent reads in full:

A snowmobile ski, comprising:

a base extending in a longitudinal direction and having a bottom for moving over snow, the base also extending in a lateral direction between a first and second edge thereof and having a top adapted to be connected to a snowmobile;

a first side portion extending in the longitudinal direction and extending downward from the first edge; a second side portion extending in the longitudinal direction and extending downward from the second edge; a first guide rod disposed on a bottom of the first side portion; and a second guide rod disposed on a bottom of the second portion.

- *"base"*

■ The court adopts Simmons' construction of the term base:

The claim term "base" means the structure which supports all of the other claimed structures of the snowmobile ski, and upon which all of the other claimed structures of the snowmobile ski stand or are mounted.

According to *Random House Webster's Unabridged Dictionary,* "base" means "the bottom support of anything: that on which a thing stands or rests: a metal base for the table."[8] The alternate construction proposed by Bombardier does not change the plain meaning as set forth by Simmons. The primary dispute—whether or not the side portions are a part of the base or whether they are separate structures supported by the base—is resolved by other language in claim 1 and does not need to be resolved at this point.

- *"bottom for moving over snow"*

The Federal Circuit determined this to mean "the underside for moving over snow" which is not limited to being flat.[9]

- *"base also extending in a lateral direction between a first and second edge thereof"*

■ The court adopts Simmons' construction of the above terms with the exception of the additional word "approximately" and the substitution of the word "base" for "ski". The changes are noted in italics:

6. *Johnson Worldwide Associates, Inc. v. Zebco Corp.,* 175 F.3d 985, 989 (Fed.Cir.1999).

7. *Day Intern., Inc. v. Reeves Brothers, Inc.,* 260 F.3d 1343, 1348 (Fed.Cir.2001).

8. RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY at 172 (2d. ed.1993).

9. *Simmons, Inc. v. Bombardier,* 73 Fed.Appx. at 423–24.

The claim term "base also extending in a lateral direction between a first edge and a second edge thereof" means the structure which supports all of the other claimed structures of the snowmobile ski (base) extends the width of the snowmobile ski in a direction *approximately* perpendicular to the longitudinal direction between first and second edges of the *base.* The term "edge" means the end or outermost lateral boundary of the snowmobile ski base.

The court agrees with Bombardier that "lateral" is not limited to being perfectly perpendicular to a longitudinal center line. For example, while longitudinal and lateral lines on a globe are perpendicular at the equator, they do not remain perfectly perpendicular around the surface of the globe. Thus, the limitation of "perpendicular" is not required by the claim language. However, it is clear that the claim terms "longitudinal" and "lateral" in the claim are referring to opposing directions so that the term "approximately perpendicular" gives the language its plain and ordinary meaning.

The primary dispute in this case is over the single word "edge." "Edge" can mean, as put forth by Simmons, "a line or border at which a surface terminates." [10] Thus, Simmons argues that "edge" must be the outermost lateral boundary of the snowmobile ski base. The court accepts this definition because of the context of the claim.

Bombardier would have this court define ·"edge" so as to make the side portions a component separate and apart from the base. It is true, as Bombardier argues,

that the claim language clearly contemplates the *base* extending in a lateral direction between the two edges of the *base* and not necessarily the edges of the entire *ski.* Nevertheless, subsequent language in the claim makes clear that the base does in fact extend the entire width of the ski. The plain and ordinary meaning of the term base is something which "supports" a structure. Webster's defines "base" as "the bottom part of anything: the support or foundation . . . ." [11] When referring to the base of a particular structure (as is the case here) the plain and ordinary meaning of base is clearly something which generally bears the weight of that structure—in this case, the weight of the ski. Thus, any ski which fits within the language of claim 1 is going to have "side portions" which are part of the "base" for the simple fact that it is the side portions which will bear the weight of the ski. This is clear from the fact that the guide rods are "disposed on a bottom" of the side portions. The purpose of the guide rods requires that they touch the ground and have weight upon them while the ski is in use.

"Claim language is given its plain, ordinary, or accustomed meaning to one of ordinary skill in the relevant art . . ." [12] Thus, in construing the plain meaning of this claim, the court must think of a person "of ordinary skill in the relevant art." If a "base" is something which supports a structure and the 594 patent describes a ski whereby the weight of the ski is going to be supported by the side portions with guide rods on the bottom of the side portions, clearly the side portions are a part of the "base." As such, the 594 patent

**10.** Random House Webster's Unabridged Dictionary at 620.

**11.** Webster's Universal Dictionary And Thesaurus at 58 (1993).

**12.** *Simmons, Inc. v. Bombardier, Inc.,* 73 Fed. Appx. at 422–23.

clearly describes a "base" which extends laterally to the "edge" of the ski.

■ Bombardier would have this court adopt a definition of base whereby the only portion of Simmons' Flexi–Ski (and the Fritz Ski upon which Bombardier demonstrates its definition of "edge") would have a base that would be the only portion of the ski not actually touching the snow and not bearing any weight of the ski. In other words, the "edges" which Bombardier identifies on the Fritz Ski may indeed be termed edges, but they clearly cannot be termed edges of the *base* of the ski. This would nullify the plain and ordinary meaning of the term base. Thus, "edge" must be defined in the context of the phrase of which it is a part because it "finds context in the surrounding words."[13] While a court cannot import limitations into the claim language, nor can the court interpret claim language so broadly as to negate the context it resides in. The construction put forth by Simmons is more in accord with the "ordinary and accustomed meaning of the claim terms."[14]

- *"having a top adapted to be connected to a snowmobile"*

As Bombardier concedes, this language is not at issue in this case. Therefore, to the extent necessary, the court adopts Simmons' proposed construction of the term: "some portion of the upper surface of the claimed snowmobile ski base is designed to allow for the attachment of the snowmobile ski to a snowmobile, with no limitation imposed on the shape of the upper surface."

- *"first side portion extending in the longitudinal direction and extending downward from the first edge; a second side portion extending in the longitudinal direction and extending downward from the second edge"*

■ The court adopts Simmons' proposed construction of this claim:

The claim term "first side portion extending in the longitudinal direction and extending downward from the first edge" means a structure forming at least part of a lateral side of the ski which extends from a higher to a lower position from the first lateral edge of the snowmobile ski base.

The claim term "second side portion extending in the longitudinal direction and extending downward from the first edge" means a structure forming at least part of a lateral side of the ski which extends from a higher to a lower position from the second lateral edge of the snowmobile ski base.

Bombardier argues that the side portions need not be perpendicular to the ground. The court does not read the construction of Simmons to require such a limitation. However, the side portions do "extend[ ] downward" from an edge, thus suggesting that, in general, such side portions will be approximately perpendicular to the ground, as for example when a person falls "downward" off the "edge" of a cliff. A strong wind might carry such a person away from the cliff at the same time they are still falling downward so that there is some slope to their fall, however, such a person is still traveling downward. Thus, downward is defined as "from a higher place to a lower ... moving or extending from a higher to a lower

**13.** *Simmons, Inc. v. Bombardier, Inc.*, 73 Fed. Appx. 421, 422–23 (Fed.Cir.2003) (citing *Hockerson–Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed.Cir.1999)).

**14.** *Johnson Worldwide Associates, Inc.*, 175 F.3d at 989.

place." [15]

More important, inasmuch as the court's prior definition of the words "base" and "edge" demonstrate that the "side portions" are a part of the base, i.e., "portion" (defined as "a part of any whole, either separated from or integrated with it . . . ." refers to a portion of the "base") Bombardier's other objections to the proposed claim construction disappear.

● *"guide rod"*

■ The court adopts Simmons' construction of "guide rod": "an elongate slender object made of a hard substance, such as metal."

● *"disposed on a bottom of the first side portion"* and *"disposed on a bottom of the second side portion"*

■ The court adopts Simmons' proposed construction:

The claim term "disposed on a bottom" means that the claimed "guide rods" are attached on the undersides of the claimed first and second downwardly extending side portions.

The Federal Circuit previously defined "bottom" to mean "underside of a given structure." The purpose of the guide rod is to touch the snow and assist in turning. Thus, the guide rods would not serve their purpose if they were only "positioned near" the bottom of the side portions, as Bombardier argues with respect to defining "disposed on." Because claim language must be interpreted according to one of ordinary skill in the relevant art, the court rejects Bombardier's proposed broadening of "disposed on." Thus, the guide rods must be placed on the bottom

of the side portions, not merely "supported by, dependent on, or positioned near the bottom of the side portions" as Bombardier has proposed.

### Claim 2

Bombardier does not dispute the proposed construction of Claim 2 put forth by Simmons. The court therefore finds that Simmons' proposed construction is consistent with the ordinary and plain meanings of the terms used and adopts it as the proper construction of the Claim.

### Claim 6

Claim 6 depends from claim 2 and must meet all of the limitations of claim 2, plus the additional limitations of claim 6.

● *"the base further comprises an upturned front portion having a front portion bottom"*

There is no dispute as to this language. The court therefore accepts Simmons' construction: "front portion" means "the foremost part of the ski" and "front portion bottom" means "the underside of the front portion." "Upturned" means "turned or directed upwards."

● *"further comprising a concavity in the front portion bottom such that snow is funneled past the front portion into the channel when the snowmobile ski is in use"*

■ The court adopts Simmons' proposed construction, except as to the portion in italics below which has been added by the court to more accurately state the meaning of the Claim:

The claim term "further comprising a concavity in the front portion bottom,

---

**15.** Random House Webster's Unabridged Dictio- nary, at 1507.

such that snow is funneled past the front portion into the channel when the snowmobile ski is in use" means the underside of the front portion of the claimed "base" is *concave, which may or may not be a rounded concavity*, such that as the snowmobile ski is in forward motion snow is directed into the claimed "channel" as though passing through a funnel.

The court agrees with Bombardier that concavity does not always connote a rounded surface, like the inside of a bowl. Rather, concavity connotes a depressed or hollow surface which may or may not have hard angles. The Minnesota District Court addressed this very issue and seemed to agree by explaining: "The dictionary defines 'concavity' as something 'hollowed *or* rounded inward like the inside of a bowl' or 'arched in.'"[16] Nothing in this definition requires a perfectly rounded shape, without hard angles.

### Claims 9, 10, and 11

Disputes over claim 10 reflect the same disputes as at issue in claim 1 and are resolved according to the resolution of claim 1. Otherwise, there are no disputes over claims 9 through 11. The court finds Simmons' construction consistent with the plain and ordinary meaning of the claim language and adopts that construction.

### Motion for Summary Judgment on Non–Priority (# 176–1)

In 1991, Verlin Simmons developed a dual-runner ski, designed to improve the handling and operation of a snowmobile.[17] On December 9, 1992, Simmons, through his attorney Alan Edwards, filed a patent application with the United States Patent and Trademark Office ("USPTO") titled "Snowmobile Ski," which was assigned Application No. 07/988,231 (the "231 application").

In July of 1993, Alan Edwards informed Simmons that he was going to leave the practice of law. Simmons thereafter retained Thomas Fehr as a patent attorney. On September 16, 1993, the USPTO issued an Office Action which rejected the claims of the 231 application. The Office Action stated that if no response was filed within three months, the application would be deemed abandoned. A response could be filed up to six months later, provided it was accompanied by an extension of time fee. Thus, as of December 17, 1993, the 231 application was abandoned. Simmons contends that the Notice of Abandonment for the 231 application was sent to Alan Edwards, who had never formally withdrawn from the 231 application.

A second application, No. 07/988,820 (the "820 application") for a "Snowmobile Ski Flexing Apparatus," was also filed on December 9, 1992. That application became abandoned in October of 1993.

A third application was filed on July 1, 1993. It eventually issued into Patent No. 5,360,220 ("the 220 patent"). The 220 patent does not contain the terms "base," "longitudinal," "over snow," "guide rod," "tapering," "forward apex," or "funnel snow into channel." These terms are all prominent in the 590 patent.

On March 14, 1994, one day short of the six-month period within which a response was due for the 231 application but three months after it was deemed abandoned, Simmons filed another patent application, No. 09/213,950 ("the 950 application").

---

**16.** *Simmons v. Koronis Parts, Inc.,* 2001 WL 1095008 at *5 (citation omitted).

**17.** *Id.* at *1.

This application eventually issued as Patent No. 5,936,594, the 594 patent embodied in the Flexi–Ski.

On March 4, 1994, ten days before the 950 application was filed, Mr. Fehr, Simmons' patent counsel, sent a letter to Simmons with a draft of the 950 application. The draft indicated: "This is a continuation-in-part of copending U.S. application [No. 231] filed on December 9, 1992." The cover letter somewhat ambiguously states that, "we could either let the original application become abandoned or spend some additional time and money arguing that a patent should issue on it for the downwardly extending sides confined to the middle portion of the ski." The letter also states that "the latter course would be somewhat safer but more expensive" and tells Mr. Simmons "the choice is yours."

When the 950 application was filed with the USPTO, the language stating that it would be a continuation-in-part of the 231 application had been removed. Indeed, in a draft of the 950 application dated March 15, 1994 the language is crossed out. Mr. Fehr testified that he could not remember why he crossed out the language, but that he only would have done so at the request of the client. Fehr also states that it may have been the result of a miscommunication. The 950 application was also filed with a Combined Declaration and Power of Attorney, signed by the inventor, which has a check box to identify "continuation-in-part" applications and a check box to identify "original" applications. The box for "original" is checked. Mr. Fehr also stated in a deposition that he had an "extremely vague recollection that Val Simmons told me the ski they had sold was completely different from the version embodied in the 950 patent application." Nevertheless, Simmons argues and prof-

fers affidavits stating that Verlin Simmons, Val Simmons, as well as the patent attorneys involved with the 950 application, intended it to be a continuation-in-part of the 231 application.

On April 26, 1994, six weeks after the 950 application was filed, the Patent Office mailed a "Notice of Abandonment" to Simmons stating that there had been no response to the last office action. Simmons states that the Notice was sent to Mr. Edwards, who was no longer a patent attorney, and that it was not forwarded. Additionally, the Notice did not state the date on which the 231 application was abandoned.

During prosecution of the 950 application, the patent examiner rejected certain claims of the 594 patent because it contained no teachings regarding how the "Loop" identified on the front of the ski functioned. The patent examiner suggested that this could be overcome by identifying the 594 patent as a CIP of the 220 patent to "obviate this inadequacy and to complete the disclosure with respect to this aspect of the instant application." On November 3, 1997, Simmons filed an amendment asking the Patent Office to add a reference stating that the 950 application is a continuation in part of the 220 patent. On March 11, 1998, Simmons filed another requested amendment to the 950 application with the Patent Office. Mr. Kunzler faxed the application to the examiner. The request stated: "At page 2, line 2, after 'patent number 5,360,220' please insert—and is also a continuation-in-part of copending U.S. Application Serial No. 07/988,231 [the 231 application] filed on December 9, 1992, now abandoned." The requested amendment is unsigned and undated. The File History notes that a "proposed amendment" was received and that

it would be granted "consistent w/ appellant's request." However, rather than amending the 950 application to read "and is also a continuation-in-part" the examiner wrote "which is a continuation-in-part." The effect of this was to identify the 231 application as the grandparent of the 950 application rather than as a second parent of the 950 application. Importantly, the 231 application was still abandoned during this time.

The 950 application was issued as the 594 patent on November 17, 1998. The 594 patent states that it is a continuation-in-part of the July 1, 1993 220 patent, and that the 220 patent is a continuation-in-part of the 231 application, dated December 9, 1992. Neither party believes this is correct. Simmons contends that the intent all along was that the 594 patent be a continuation-in-part of the 231 application. However, Simmons took no action to correct the 594 patent until more than two years after it was issued. Thus, between November of 1998 and May of 2001, the erroneous priority data appeared on the face of the 594 patent. The 231 application had been abandoned during this entire time.

On November 12, 1999, Simmons filed a complaint against Koronis, Inc., another snowmobile manufacturer, alleging infringement of the 594 patent. In June, 2001, Koronis filed a motion for summary judgment, arguing that the 594 patent was invalid by reason of the on-sale bar under 35 U.S.C. § 102(b). At a hearing on June 13, 2001,

> Koronis argued that Verlin Simmons testified in his deposition that Simmons, Inc. was selling skis encompassing the claims of the '594 Patent in January of

1993. As part of their response to this allegation, Simmons, Inc. asserted that they have applied for a revival of the abandoned '231 Application with the [USPTO]. Simmons argued that if the '231 Application is revived, the '594 Patent may refer back to the '231 Application and use its earlier December 9, 1992 filing date to avoid any on-sale bar resulting from January 1993 sales.[18]

The motivation for Simmons to revive the 231 application came as a result of this litigation. Simmons states that it was not aware that the 231 application had been abandoned until the Koronis litigation.

Pursuant to 37 C.F.R. § 1.137(b), Simmons filed a Petition for Revival of an Application for Patent Abandoned Unintentionally. The Petition for Revival was accompanied by a request for a three-month extension of time and an extension fee, the purpose being to establish copendency between the 231 application and the 950 application. On August 8, 2001, the Patent Office granted both the Petition for Revival and the extension. The Patent Office expressly stated that the Petition for Revival

> [M]et the requirements to revive the parent application [the 231 application] under 37 C.F.R. § 1.137(b). The above-identified application [the 231 application] is being revived solely for the purposes of continuity. As continuity has been established by this decision reviving the application, the application is again abandoned in favor of the continuation-in-part filed March 15, 1994 [the 950 application].

However, the face of the 594 patent still incorrectly identified the relationships between the patents, identifying the 594 pat-

18. *Simmons, Inc. v. Koronis, Inc.*, 2001 WL 1095008 at *2.

ent as the "grandchild" of the 231 application, rather than directly as a "child" as intended. Thus, on August 14, 2001 Simmons filed a Request for Correction of Office Mistake for the 594 patent. Simmons apparently decided against pursuing the Request for Correction and on December 12, 2001 asked the Patent Office to withdraw and cancel the Request "in view of a reissue patent application to be filed." Simmons never filed a reissue application. Simmons states that it did not pursue correction of the error because it did not believe it was necessary.

■ Two issues are raised by Bombardier's Motion for Summary Judgment of Non–Priority Under 35 U.S.C. § 120: First, what is the proper priority date for the 594 patent? Second, if the face of the 594 patent incorrectly reflects the priority relationship, does this court have the power to correct it? The court finds that patent 594 cannot claim to be a continuation-in-part of patent application 231. The court further finds that it does not have power to correct the claimed error on the face of patent 594. Therefore, summary judgment on this issue is hereby GRANTED in favor of Bombardier.

Claims in a patent application may receive the benefit of the filing date of a parent application if a proper priority claim is made.

An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United State, or as provided by section 363 of this title, which is filed by an inventor or inventors named in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.[19]

This statute reveals four requirements which must be met before a patent application can claim the priority date of an earlier-filed application: (1) the invention must be disclosed in the parent application pursuant to 35 U.S.C. § 112; (2) the inventor must be the same as in the prior application; (3) the present application must have been filed before the abandonment of the prior application; and (4) the present application must make a specific reference to the earlier filed application. "The plain and unambiguous meaning of section 120 is that any application fulfilling the requirements therein 'shall have the same effect' as if filed on the date of the application upon which it claims priority."[20] The dispute in this case is whether the 231 application was copending with the 950 application, and whether the 594 patent which issued from the 950 application specifically references the 231 application. If either of these requirements are not satisfied, the 594 patent cannot claim the priority date of the 231 application.

### Copendency

There is a genuine issue of material fact with respect to copendency. There is no

**19.** 35 U.S.C. § 120.

**20.** *Transco Products, Inc. v. Performance Contracting, Inc.,* 38 F.3d 551, 556 (Fed.Cir. 1994), *cert. denied,* 513 U.S. 1151, 115 S.Ct. 1102, 130 L.Ed.2d 1069 (1995).

dispute that when Simmons filed the 950 application, the 231 application had already been abandoned. Indeed, the 231 application remained abandoned for nearly eight years. However, it is also undisputed that Simmons filed a Petition to Revive the 231 application which was granted by the USPTO. In its decision granting the Petition, the USPTO specifically stated that it was done "solely for the purposes of continuity" and that as a result of the revival "continuity has been established." Further, the Manual of Patent Office Examining Procedures states that "[i]f an abandoned application is revived . . . it becomes reinstated as a pending application and the preceding period of abandonment has *no effect*." [21] Therefore, given the revival and the extension granted to the 231 application, it is clear that the 950 application was filed "before the . . . abandonment of . . . the first application . . ." [22]

### Specific Reference

In order for a patent to claim the priority date of an earlier patent application it must also specifically reference the earlier application.[23] There is no doubt that the 594 patent references the 231 application. That reference, however, contains a misstatement of the relationship claimed by Simmons. Therefore, the question is whether the misstated reference satisfies the specific reference requirement of 35 U.S.C. § 120.

Patent Office Rule 78 states that the "specific reference" must include language "indicating the relationship of the applications." [24] "Court decisions accept Rule 78(a) as defining the meaning of 'specific reference' in Section 120." [25] Thus, in *Sampson v. Ampex Corp.*,[26] the Second Circuit rejected a claim to an earlier priority date where the patentee had failed to meet the requirements of Rule 78. Specifically, the "1964 application did not contain a reference to the 1961 application, to say nothing of the 'specific reference' to serial number, and filing date, *and a statement of the relationship* between the two applications, as required by Rule 78(a)." [27] The Ninth Circuit has also stated that Rule 78 governs the "specific reference" requirement. "It seems clear that if the benefit of the filing date of a prior application is claimed, the subsequent application must contain or be amended to contain a reference in the specification to the prior application identifying it by serial number and filing date *and indicating the relationship of the applications*." [28]

Section 201 of the Manual of Patent Examining Procedure states:

Proper identification of priority applications is essential to establishing accurate and complete relationships among various patent documents which reflect the same invention. Knowledge of these relationships is essential to search file management, technology documentation

---

21. Manual of Patent Examining Procedure § 201.11(6th ed., rev. 2 1996) (emphasis added).

22. 35 U.S.C. § 120.

23. 35 U.S.C. § 120.

24. 37 C.F.R. § 1.78.

25. Chisum on Patents § 13.06.

26. 463 F.2d 1042 (2nd Cir.1972).

27. *Id.* at 1045 (emphasis added).

28. *Hovlid v. Asari,* 305 F.2d 747, 751–52 (9th Cir.1962).

and various other purposes.[29]

Neither party argues that the 594 patent contains a correct recitation of the relationships involved. Simmons states that the 594 patent is in actuality a CIP of the 231 application of December 9, 1992 and that the mistake is due to an error of the USPTO. Regardless of where the error lies, Simmons was the party who was in a position to ensure that the face of the 594 patent accurately reflect the relationship between the applications. Simmons states that it did not become aware of the mistake until two years after it was committed. However, even a cursory inspection would have revealed the mistake to Simmons. As the Federal Circuit has stated, "It does not seem to us to be asking too much to expect a patentee to check a patent when it is issued in order to determine whether it contains any errors that require the issuance of a certificate of correction."[30] Had Simmons immediately insisted on correction, this issue would not be before the court.

This requirement [of making a specific reference] imposes no great hardship on an applicant, since he is assumed to be intimate with the details of the relationship of his various applications and the public stands to benefit by being able to determine the effective date of an application without engaging in a long and expensive search and comparison of previous applications.[31]

To be sure, the 594 patent does contain a reference to the 231 application and the date of priority which is claimed and merely misidentifies the claimed proper relationship of the applications. Simmons argues, therefore, that no public policy has been violated as a person looking at the 594 patent could "determine with a minimum of effort the exact filing date upon which a patent applicant is relying to support the validity of his application or the validity of a patent issued on the basis of one of a series of applications."[32] However, it seems clear that not only is it appropriate to require a statement of some relationship in an application, but a statement of the *correct* relationship. Parties viewing a patent and taking legal risks based upon it are entitled to know the correct relationship of the applications. Simmons was the only party in a position to know the claimed correct relationship and chose not to correct the 594 patent. As such, the court finds that while Patent 594 contains a reference to the 231 application, it does not contain a specific reference as required by 35 U.S.C. § 120.

### Correction by the Court

■■■ The next question presented is whether the court can correct the alleged mistake on the face of patent 594. The court concludes that it does not have the power to correct the mistake.

It is clear that this court has some power to correct mistakes so as to "give to [the patent] the meaning which was intended by the applicant and understood by the examiner."[33] However, absent statutory authority, district courts are limited to cor-

29. MANUAL OF PATENT EXAMINING PROCEDURE § 201.14(d).

30. *Southwest Software, Inc. v. Harlequin, Inc.,* 226 F.3d 1280, 1296 (Fed.Cir.2000).

31. *Sampson v. Ampex Corp.,* 333 F.Supp. 59, 65 *aff'd* 463 F.2d 1042 (2nd Cir.1972).

32. *Sampson v. Ampex Corp.,* 463 F.2d 1042, 1045 (2nd Cir.1972).

33. *I.T.S. Rubber Co. v. Essex Rubber Co.,* 272 U.S. 429, 442, 47 S.Ct. 136, 71 L.Ed. 335 (1926).

recting "obvious minor typographical and clerical errors in patents." [34] Where the subject of correction is "subject to reasonable debate" district courts do not have the power to correct an alleged mistake.[35]

A misstatement of the alleged proper relationships between two patent applications is not an obvious minor clerical error. Rather, correcting the error alleged by Simmons would be a substantial revision of patent 594. Further, "where the error is not evident *from the face of the patent itself* ... it is important that the PTO bring its expertise to bear and consider whether such a correction is appropriate." [36] The mistake claimed by Simmons is certainly not evident from the face of the patent itself. As such, the court finds that it would be inappropriate to correct the patent in the manner requested. Therefore, Simmons cannot claim a priority date for patent 594 of December 9, 1992.

### Setting the Priority Date

▉ There remains the question of whether the priority date for patent 594 should be set at July 1, 1993, or at March 15, 1994. Patent 594 states that it is a continuation in part of patent 220, dated July 1, 1993. Bombardier argues that patent 594 cannot be a CIP of patent 220 because patent 594 introduced "new matter" including concepts such as "base," "longitudinal," over snow, "guide rod," "tapering," "forward apex," and "funnel snow into the channel." [37] Bombardier further

argues that the 220 application "fails to meet the enablement and written description requirements of § 112." [38]

For some reason, in response to the facts set forth by Bombardier, Simmons states that "[n]either party disputes that the '594 Patent claims to be CIP of the 220 Patent" and that "[t]he '594 Patent's relationship to the '220 Patent has no bearing on the question of whether it has priority to the '231 Application." [39] In fact, in its Undisputed Facts No. 12, Bombardier states that the text of Patent 220 "does not contain any of the following: 'base,' 'longitudinal,' 'over snow,' 'guide rod,' 'tapering,' 'forward apex,' 'funnel snow into channel.'" [40] In its response to this particular undisputed fact, Simmons states that these facts are "True but immaterial" and that the "exact language that appears in the '220 Patent is not material to any fact relating to Bombardier's current motion on the priority claim of the '594 Patent." [41]

It is not clear to the court why Simmons does not address Bombardier's arguments with respect the patent 594's claimed relationship with patent 220. In footnote 2 of its Memorandum in Opposition, Simmons mistakenly asserts that "Bombardier's motion is directed only to the issue of whether the '594 Patent is entitled to claim priority to the filing date of the '231 Application .... Bombardier does not assert, and accordingly Simmons has not addressed, whether in the absence of such priority to any other date prior to the

---

**34.** *Novo Industries, L.P. v. Micro Molds Corp.,* 350 F.3d 1348, 1357 (Fed.Cir.2003).

**35.** *Id.*

**36.** *Id.* (emphasis added).

**37.** Memorandum in Support at 24.

**38.** *Id.*

**39.** Memorandum in Opposition at 16.

**40.** Memorandum in Support at 9.

**41.** Memorandum in Opposition at 10.

filing of the '950 Application." [42] However, Bombardier has clearly argued that patent 594 cannot properly claim to be a CIP of patent 220 because Patent 594 introduces "new matter." In addition, the relief requested by Bombardier was to set a priority date for patent 594 of March 15, 1994.[43]

Bombardier set forth in its facts the "new matter" it alleges is contained in patent 594 and Simmons admitted the facts as true. As such, the court is forced to conclude that patent 594 cannot claim to be the CIP of patent 220. Therefore, by default, patent 594 is left with a priority date in accord with the filing of its own application, March 15, 1994. Therefore, Bombardier's Motion For Summary Judgment of Non–Priority is GRANTED (# 176–1). The court finds that patent 594 has a priority date of March 15, 1994 and will proceed to the other motions for summary judgment on that basis.

**Plaintiff's Motion for Summary Judgment on Defendants' Inequitable Conduct Defense (# 209–1) and Bombardier's Request for a Bifurcated Hearing (# 230–1)**

Bombardier asserts the defense of inequitable conduct with respect to two events: (1) the Revival Petition filed by Simmons' with the USPTO to revive the '231 Application; and (2) Simmons' failure to disclose the Fritz patent to the USPTO prior to its issuance of Patent 594. Bombardier also asks for a bifurcated hearing with respect to these issues. For the reasons stated at oral argument, the court reserves these issues until a later date.

**Cross Motions for Summary Judgment on Anticipation (# 199–1 and # 205–1)**

Bombardier asks the court to declare summary judgment in its favor by finding that the 594 patent is invalid because it was anticipated by prior art. Simmons has also filed a motion for summary judgment asking the court to declare that there was no anticipation. The court finds that the 594 patent was not anticipated and grants summary judgment in favor of Simmons on this issue.

 Under 35 U.S.C. § 282, a patent issued by the United States Patent and Trademark Office is presumed valid. A party wishing to invalidate a patent must establish its invalidity by clear and convincing evidence.[44] "[T]he burden of persuasion [is] on the party who asserts that the patent is invalid." [45] Thus, unless a reasonable jury could find by clear and convincing evidence that the 594 patent was anticipated by prior art, summary judgment is appropriate in favor of Simmons.

 "A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." [46] The court's resolution of the proper claim construction with respect to the word "edge" and the "downwardly extending side portions" effectively resolve Bombardier's claim that the Fritz Twin Track Ski anticipated claims 1 and 2 of patent 594. As construed by the court,

---

**42.** Memorandum in Opposition at 29, n. 2.

**43.** Memorandum in Support at 35.

**44.** *Helifix Ltd. v. Blok–Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed.Cir.2000).

**45.** *AIR-vend, Inc. v. Thorne Industries, Inc.*, 625 F.Supp. 1123, 1130 (D.Minn.1985) *aff'd* 831 F.2d 306 (Fed.Cir.1987).

**46.** *Schering Corp. v. Geneva Pharmaceuticals, Inc.*, 339 F.3d 1373, 1377 (Fed.Cir.2003).

the "edge" is the outermost portion of the ski, at which point the side portions extend downward. On the Fritz Twin Track Ski, the "side portions," if they can be called such, extend downward before reaching the edge of the base, or the outermost portion of the ski. Therefore, the Fritz patent does not anticipate independent claims 1 and 10, or dependent claims 2, 6, 9, or 11.

Bombardier's claim that the Fritz ski anticipated claim 6 of the 594 patent is also resolved by the court's claim construction. While the court agrees with Bombardier that "concavity" does not require a perfect roundedness, it does require a hollowness or a rounding inward. This court agrees with the District of Minnesota, which previously determined that the Fritz patent "does not evidence a concave bottom portion by 'clear and convincing evidence.' "[47] Thus, there is no genuine issue of material fact as to claim 6.

The court also finds that Simmons' First Generation Ski does not anticipate the 594 patent. The First Generation Ski does not have edges from which side portions extend downward. The Eleneke patent also does not anticipate patent 594 for the simple fact that it does not disclose a "top adapted to be connected to a snowmobile," nor does it disclose guide rods. Therefore, Plaintiff's Motion for Summary Judgment on No Anticipation is GRANTED (# 205–1).

## Cross Motions for Summary Judgment on Non–Obviousness (# 199–1 and # 211–1)

Both sides seek summary judgment on the issue of obviousness. Unlike the defense of anticipation, which requires looking at a single piece of prior art, the defense of obviousness requires clear and convincing evidence that " 'differences between the subject matter to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.' "[48] The court finds that no reasonable jury could find by clear and convincing evidence that patent 594 is invalid based on the defense of obviousness.

Four factual inquiries—the so-called Graham factors[49]—are involved in determining obviousness: "(1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) secondary considerations of nonobviousness, which in case law is often said to include commercial success, long-felt but unresolved need, failure of others, copying, and unexpected results."[50]

The court first notes that the fact that individual elements of a claimed invention have appeared in prior art is not sufficient for a finding of obviousness. "[C]ombination claims can consist of combinations of

47. *Simmons v. Koronis*, 2001 WL 1095008 at *5.

48. *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1349 (Fed.Cir.2001) (quoting 35 U.S.C. § 103(a)).

49. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

50. *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 663–664 (Fed.Cir.2000).

old elements as well as new elements." [51] "The genius of invention is often a combination of known elements which in hindsight seems preordained." [52] But hindsight evaluation is exactly what this court must avoid.[53] "To prevent hindsight invalidation of patent claims, the law requires some 'teaching, suggestion or reason' to combine cited references." [54]

Bombardier has failed to identify such a teaching. For example, Bombardier's expert, Stan Johnson, merely identified twelve patents and prior art skis that he believed collectively contain the elements or features of the claims of the 594 patent. He does not identify a "teaching, suggestion or reason" motivating the combination.[55]

Bombardier is correct that such a motivation "may flow from the prior art references themselves, the knowledge of one of ordinary skill in the art, or, in some cases, from the nature of the problem to be solved." [56] But unless the solution is obvious to one of ordinary knowledge in the skill, the inventor who actually solves the problem should not be punished.

Further, the court has already discussed above in both the claim construction section and the anticipation section, the reasons the Fritz Twin Track Ski (the prior art Bombardier primarily relies upon again here) does not tread upon the claims of the 594 patent. It is also important to note that the Fritz ski was on the market for more than 15 years before Simmons' Flexi–Ski. The problems solved by the Flexi–Ski were well-known during this time. Yet it was the Flexi–Ski which apparently solved these problems. It is difficult to imagine that the solution was obvious in the light of this time-span.

Finally, the secondary considerations element of the Graham factors is compelling in this case. "Secondary considerations may be . . . the most probative evidence in the record regarding obviousness." [57] One such secondary consideration is the existence of a long-felt but unresolved need.[58] Simmons put forth persuasive evidence that the Flexi–Ski, the embodiment of the 594 patent, solved at least three such needs: improved cornering, better overall handling, and the elimination of darting (the propensity of a snowmobile ski to follow the ruts left by prior snowmobiles). Indeed, this was the primary reason Bombardier used the Flexi–Ski in designing its own Precision Ski.

Another secondary consideration is how the industry greeted the product.[59] Here again Simmons put forth persuasive evidence that the Flexi–Ski was heralded as

---

**51.** *Clearstream Wastewater Sys., Inc. v. Hydro–Action, Inc.,* 206 F.3d 1440, 1446 (Fed.Cir. 2000).

**52.** *McGinley,* 262 F.3d at 1351.

**53.** *Id.*

**54.** *Id.*

**55.** *Id.*

**56.** *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.,* 229 F.3d 1120, 1125 (Fed.Cir. 2000).

**57.** *Procter & Gamble Co. v. Paragon Trade Brands, Inc.,* 989 F.Supp. 547, 593 (D.Del. 1997).

**58.** *Ruiz v. A.B. Chance Co.,* 234 F.3d at 662.

**59.** *Vulcan Engineering Co., Inc. v. Fata Aluminium, Inc.,* 278 F.3d 1366, 1373 (Fed.Cir. 2002).

"revolutionary" and "unique."[60] Simmons also put forth persuasive evidence that the Flexi–Ski produced unexpected results, further suggesting that its design was not obvious.[61]

Finally, Simmons also put forth abundant evidence that the Flexi–Ski met with great commercial success, another secondary factor which courts consider.[62] For example, in 2000, Simmons Flexi–Ski accounted for 96.5 percent of Simmons' total sales of $1,705,517.[63]

As a final secondary factor, the court notes that Bombardier admitted that in designing its Precision Ski it looked only at the Flexi–Ski and attempted to "design around" it. Thus, while Bombardier argues that the Flexi–Ski was anticipated by prior art and was obvious in the face of prior art, it chose to rely solely on the Flexi–Ski in its design. Such copying is evidence that the patented device has characteristics which are not available or obvious in the prior art.[64]

For the foregoing reasons, the court finds that no reasonable jury could conclude, by clear and convincing evidence, that the 594 patent is invalid for obviousness. Therefore, Plaintiff's Motion for Summary Judgment of Non–Obviousness is GRANTED (# 211–1).

### Bombardier's Motion for Summary Judgment on Non–Willfulness (# 197–1)

Enhanced damages in a patent infringement case are available only where there is clear and convincing evidence of a willful violation of the patent. The party claiming infringement must show by clear and convincing evidence that "the infringer acted in disregard of the patent, that the infringer had no reasonable basis for believing it had a right to engage in the infringing acts."[65] The court holds that no reasonable jury could find, by clear and convincing evidence, that Bombardier willfully infringed the 594 patent.

When competent legal advice is obtained and followed, the alleged infringer has a valid defense against willfulness.[66] In this case, there is no question that Bombardier sought and obtained advice from counsel that its design would not infringe patent 594. The only questions raised are as to the timing of the opinion and its competence.

Simmons argues that by the time Bombardier received its first opinion from counsel regarding its design it had already finalized its design and decided to go forward with production. The court finds this unpersuasive. The fact is that Bombardier sought advice from counsel at a stage in the process when it was still free to change its design or not go forward with it at all. Further, the fact that Bombardier had finalized its design and decided to go forward with production before seeking outside counsel makes perfect sense. Why spend large amounts of money evaluating potential infringement by a product that is

---

**60.** Memorandum in Support of Summary Judgment on Non–Obviousness at Facts 5–16.

**61.** *Id.*

**62.** *Vulcan Eng'g Co.*, 278 F.3d at 1373.

**63.** Memorandum in Support at 33.

**64.** *Asahi/America, Inc. v. MFRI, Inc.*, 36 F.Supp.2d 618, 622 (S.D.N.Y.1999).

**65.** *Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1056 (Fed.Cir. 1994).

**66.** *Read Corp. v. Portec Inc.*, 970 F.2d 816, 828–29 (Fed.Cir.1992).

still in the design stage and perhaps not worthy of producing? It does not seem unusual that a company would want to finalize a design before seeking an opinion on infringement for the simple fact that changes made after receiving such an opinion would risk negating the opinion concerning infringement.

Simmons also argues that the opinion on infringement was incompetent. However, the fact that Judge Kimball reached the same conclusion as the opinion sought by Bombardier suggests that the opinion was not incompetent and was in fact based on a good faith review of the evidence and a fair attempt to reach the correct answer.[67] That Judge Kimball's ruling was later reversed on technical grounds does not establish that the conclusions were unreasonable. In addition, the opinion sought from outside counsel confirmed the judgment of Bombardier's own counsel, further suggesting good faith reliance on the opinion of competent counsel.

Finally, the evidence put before the court establishes that Bombardier was aware of the potential for infringement, discussed it with Simmons, and broke off negotiations with Simmons only after reasonably coming to the conclusion that it could "design around" the patent.

In sum, Bombardier believed it had "made specific changes deemed adequate by counsel to avoid infringement."[68] As such, the court finds that a reasonable jury could not find willfulness by clear and convincing evidence. Therefore, Defendants' Motion for Summary Judgment on Non–Willfulness is GRANTED (# 197–1).

## Conclusion

The motions are resolved as follows:

1. Plaintiff's Motion for Summary Judgment on Claim Construction (# 207–1) is GRANTED IN PART and DENIED IN PART.

2. Defendants' Motion for Summary Judgment on Non–Priority (# 176–1) is GRANTED.

3. Defendants' Motion for Summary Judgment of Non–Infringement and/or Invalidity of Simmons' Patent (# 199–1) is DENIED.

4. Plaintiff's Motion for Summary Judgment on No Anticipation (# 205–1) is GRANTED.

5. Plaintiff's Motion for Summary Judgment on Non–Obviousness (# 211–1) is GRANTED.

6. Defendants' Motion for Summary Judgment on Non–Willfulness (# 197–1) is GRANTED.

7. Plaintiff's Motion for Summary Judgment on Defendants' Inequitable Conduct Defense (# 209–1) and Defendants' Request for a Bifurcated Hearing (# 230–1) are held over until after trial.

At oral argument the court notified the parties of its intent to treat Plaintiff's Opposition to Defendants' Motion for Summary Judgment on Non–Infringement and Invalidity as a motion for summary judgment on the issue of Bombardier's alleged infringement. As such, Defendants' response brief is due no later than August 6, 2004. Plaintiff's reply to the response is due no later than August 18, 2004.

**67.** *Simmons Inc. v. Bombardier Inc.*, 2002 WL 31956160 (D.Utah 2002).

**68.** *Id.* at 828.